1903 and 1909, Mr. Leone and Mr. Zornow. May it please the court, George Leone representing the United States. I'd like to reserve six minutes for rebuttal. Granted. The defendants in this prosecution perpetrated a massive stock fraud that concealed the growing gap between Bristol's sales projections and And a lot of these uh... matters that your theories of liabilities are still extant, right? Aiding and abetting is still out there, correct? Aiding and abetting is still out there, yes. And what else is still extant and is not really being dealt with on appeal? We have a number of other theories including the misstatements in the the direct knowing misstatements in the analyst conference calls. Yeah, the conspiracy. And a 10b-5 A and C. So... Among others. In looking at this, I mean just looking at it from 10,000 feet, it looked like what happened is that the court was another theory and it looked as if at the outset you said that your theory was fiduciary duty and the court was saying that they were having some issues with that under the Oren case because it doesn't, didn't look like it fit and you're saying but it is fiduciary duty that we're talking about as our additional theory and then all of a sudden you come out with this new theory under the third prong of Oren and it looks as if the court is saying, you know, you had your chance, it's over. Your Honor, I don't think that's the way the record shows. I think in this instance the government has been alleging for some time repeatedly that under the Fifth Circuit's case in Berry and under the Enron prosecution and the other district court cases that have followed it, the government can't allege. As as here where the defendant says, I don't, I didn't have the mens rea, my fellow joint presenter didn't have the mens rea, the government can prove that even if your fellow joint presenter did not have the mens rea, that if a high corporate officer is making a joint presentation and he hears his co-presenter making a statement that is knowing, which the high corporate officer knows is false and the high corporate officer has a chance to correct it, he must correct it. He cannot, with the intent to defraud the shareholders, allow that statement to go forward. So he's on an analyst call, Schiff and Lane. Yes. You're saying that Schiff hears Lane say something that is incorrect and you've got a, what, 10b-5 claim relating to that, do you not? We have a 10b-5 claim as to whether, as to that statement, if Lane made that statement with the proper c-enter. And you also, you're covering under conspiracy, but what's your theory here then? The theory here, as endorsed by the Fifth Circuit and Berry, is that if, regardless of what Lane knows, if Schiff knows that what Lane has just said is materially false and will deceive the investors if left uncorrected, because they are giving a joint presentation, Schiff has an obligation to step in and say, and set the record straight. But did Berry address the viability of your, as the court would say, district court, new legal theory? Again, I don't think this is a new legal theory, Aaron. I don't think that's really how we maintain it. But I think that's the way Judge Hochberg was talking about it, was she not? We had maintained this theory for some time. She did so characterize it, but we had, in fact, maintained it for some time. Well, I mean, just going back, at the October 30, 07 hearing, the court said, in the section of the brief on his actual statement, something he uttered, you cite Orrin in the AUSA. That's correct, the court. But on the section of the brief dealing with his omissions to state, when Schiff said something, there is only his fiduciary duty, the court, that that's right. Where is it that you're, when did you first bring up, then, the claim here that, yes, we were making this theory of liability all along? We first brought up that claim, Your Honor, in the arguments that, in the briefing, in the arguments that preceded the October motion to dismiss hearing with Mr. Lane's motion. At the time, only Mr. Lane was raising this claim. And we brought this up, and we argued that under Barry, he had a duty, and that duty arose in part through his, because of his fiduciary duty. The court denied Schiff's motion. Later, it allowed Schiff to re-raise Lane's motion, and we persisted in this argument that Barry, Causey, and Smarttalk allowed us a theory, a backup theory of liability, if, in fact, that Schiff contended Lane did not have the proper scienter. And we maintain that theory throughout. Counsel, I want you to help me out. I'm a bit confused as to what we're doing here today. Certainly, Your Honor. This is an interlocutory appeal. Yes, sir. There was a motion to dismiss filed in the district court. Yes. And the counts in the indictment were not dismissed. Theories from the indictment were dismissed, Your Honor. Theories from the indictment. There are no counts that are entirely dismissed. Well, were any counts dismissed at all? These theories were dismissed. No, I'm not, you're talking theory. I'm talking about what you have in the indictment. We are allowed to appeal, Your Honor, if the court dismisses any indictment, any counts in the indictment, any part of a counts in the indictment. These are parts of the counts in the indictment. It seems to me that what you're really talking about here are evidentiary rulings in limine by the court saying you cannot prove  in your indictment with this kind of evidence. And the court ruled in favor of the opposing party in that motion in limine on that kind of evidence to prove what you've alleged. Isn't that what this case is about? No, Your Honor. The court, this was raised in a motion to dismiss by Mr. Lane. Yes. When Mr. Schiff's motion was denied and he was allowed to have a second motion to dismiss, first he tried to raise it through a motion in limine, but the court recognized that he was trying to dismiss theories from the indictment. He was not raising evidentiary determinations. And the court required him to convert it into a motion to dismiss and then granted a motion to dismiss. And we are appealing that motion to dismiss. Dismiss what? Dismiss these parts of the counts, these theories from the indictment. But not dismissing the actual claim of aiding and abetting or conspiracy or scheme or anything like that? Dismissing this portion of the scheme, of the claim, but not all of the other claims, no. But the United States is entitled to meet our heavy burden beyond a reasonable doubt to go forward with all valid theories that we've brought forward. Did you make a motion for reconsideration? No, Your Honor. It was quite clear that that was not likely to succeed. Isn't it possible that when this case goes back, that you would attempt to have the court consider the evidence, the theory of liability, to support the two counts in the indictment that you have? And couldn't the court change its mind since it's not really a final ruling? It is a final ruling as to these theories, Your Honor. But it can be changed by the court. It's interlocutory, isn't it? Well, Your Honor, that puts us in an extremely difficult position. The court has made quite clear its ruling against us on these theories. It has given no indication that it is. Well, it hasn't read our opinion yet. Well, we're looking forward to your opinion, Your Honor. And this is our only opportunity in which to appeal. If the court were to re-raise this during trial, we'll have no opportunity to appeal if the court rules against us. So it's really not strongly contested that this first issue is ruled upon. In fact, I don't think it's contested really at all. And that we have a right to appeal it. And because, as the Fifth Circuit said, a high corporate officer cannot sit by and allow another of his joint presenters to make such a statement that he knows will mislead investors unless corrected. And with the intent to defraud, refuse to correct it, the district court should have followed those cases rather than ruling that they did not apply. It should have permitted that evidence to come in, but in the motion to eliminate, it denied it. It should have not dismissed that theory from the indictment. Your Honor, the defense tried to sneak it in as a motion to eliminate it. The district court didn't let it. And there's an order down below that we're appealing from that says, motion to dismiss granted in part. That's what we're appealing. And we have a right to appeal that. The, um... So, let's go to the Oren case. Is Oren the three theories of liability that the court's listed there, are they exclusive? No, Your Honor, they're not. The Oren based its theories on cases that derived back from the First Circuit case called Roeder. And the First Circuit has made clear that its precedent is not exclusive. And this court has said in Wiener that this is as a general matter. These are the three bases on which... But in Wiener, we stated that, quote, an affirmative duty arises only when, cited verbatim, the three prongs of Oren. And immediately before that, Your Honor, this court carefully said, as a general matter. And the whole meaning of the word phrase, as a general matter, is that there can be an exception to it. And this court would not have been as unwise... Just to see if we can tease this out. I thought then what you were saying is that there was a fiduciary duty owed on that analyst's call that could raise what ostensibly is a fourth disclosure duty. Yes, Your Honor. And the court didn't buy that. That's correct. And I thought at one point you were saying, and that's the reason I was going back to the October 30, 07 hearing, that you were saying that's the additional theory beyond what Oren says, that's the additional theory that you're going off on. Yes, that and Barry, Your Honor. But we're not bound by Barry. No, of course not. And Barry doesn't even talk about, doesn't hold on the viability of that particular theory. Yes, it does. Barry did not reverse his motion to dismiss that was based on the idea that only the speaker could possibly commit a 10b-5 violation in that situation and holds that if the person knowingly knows that what's being said is materially false and with the intent to defraud is not corrected, he is also liable. I thought that what Barry talked about didn't go quite as far. I thought Barry dealt with the heightened pleading standard. Barry did deal with the heightened pleading standard because it was a civil case and it held dissatisfied even the heightened pleading standard of a civil case. In a criminal case, we clearly are in a better position than that because we don't have to meet the heightened pleading standard because the risk of fraud of a strike suit is not present. But I didn't think Barry dealt with the viability of the legal theory that you have a duty to speak in the circumstance like we have here based on a fiduciary obligation. Barry did not mention fiduciary obligation directly, but it did deal with the theory and it hinged its finding on that theory based on the fact that the person was a high corporate officer. High corporate officers have a fiduciary duty. So the fiduciary duty is not the sole basis on which this theory is justifiable, but it's certainly a strong support for it. So, okay. Are you still talking about the claim or theory of liability that there is a fiduciary duty that Schiff should have spoken up when Lane misspoke? Yes. And, but the court has decided that that's not a good theory. Is that correct? That's correct. And is there an additional theory that you have trying to fit within Oren that goes beyond fiduciary duty? Your Honor, there was an argument made, which seems self-evident to me and that's why it keeps coming out of my mouth, but I've been that the third prong of Oren, which refers to a a you have a duty to disclose may arise where there is an inaccurate, incomplete, or misleading prior disclosure. That this is in fact a situation where there's an accurate, misleading, or incomplete prior disclosure. And that there's no limitation that the defendant is trying to import into Oren that says that that has to be that person's misleading, inaccurate, or And that's where I may have prematurely said at the outset, the court was saying, wait a minute, you're basing your theory on fiduciary duty. And this is October 30th, 2007. Yes. You never said at that time that you were basing it on the third prong of Oren. And in fact, Your Honor, we have admitted below that we had taken the position that it was, that Oren was not exclusive and that we were arguing that it was not exclusive. My only point to you here since you've raised it. Yeah, I understand that. But when was the first time that you went back and said, okay, we think we fit within the third prong of Oren that there is a duty to disclose when there's an inaccurate, incomplete, or misleading prior disclosure? I believe, Your Honor, of a third party. That that is the October 30th argument. And I believe at that point we conceded that we hadn't raised it before. All I would add for you is that we have clearly raised the argument that there's a theory of liability under Barry and that Oren is not precluded. We are arguing to you that Oren is not exclusive. If this Court wishes on its own to resolve this question by saying, well, we don't have to get to whether Oren is exclusive because we think this falls into the third prong, this Court can do so. Okay. But I think that the crucial thing here is that this is a joint presentation. Corporations engage in joint presentations for the purpose of having the additional assurance that the shareholders... Let me just make sure I understand. When was the first time that you said that we are relying on a theory of liability for shift to correct what Lane said during the analyst's call on anything other than fiduciary duty? Anything other than fiduciary duty and Barry, Your Honor. I believe it was in that October 30th argument. But the... I mean, it looks, in looking back at the record, that the first time with the Court's March 19 ruling was what, March 19 of 08? That's correct. I think the Court is saying that it looks like the first time that you really even brought this up might have been February 26 of 08, and that was just too late. Your Honor, I think that that is... There's two issues of theories that have been dismissed, and I think that explains a little bit why we're going past each other. It's because the Court there is talking not about Barry, not about Oran, not about shift's liability to correct Lane's statements. It's talking about shift's responsibility in his... the 10-Q report, SEC disclosure forms that he prepares, and or files, and or signs, excuse me, to make statements in that management disclosure and analysis, management disclosure and analysis provision to explain his prior statements in the analyst conference calls. We had argued, so we're on the second claim here, not the first one, in terms of your question. We had argued that the 10-Qs came in because the 10-Qs contained misleading statements  sales figures that were based on these non-demand sales without disclosing that they were controlled. That we could not make that argument because we had waived it, which we think is incorrect. But in any case, we also argued at that time in the February hearing that, and leading into the February hearing, that shift had a responsibility, even if he didn't have to correct the sales figures in the 10-Q itself, he had to correct his prior misstatements in the analyst calls. And that he had to do so because this was... Now you're shifting. So he's not... He doesn't have to correct Lane's misstatements, but he has to correct his own misstatements? There are two separate things. In this sense, the situation that you're raising with the district court in its opinion said we came up with a new theory at the April 26th hearing is about the second situation. It's about whether Schiff has an obligation in the 10-Qs to correct his prior misstatements in the analyst conference calls. And we raised that theory, and the district court did not forbid us from raising that theory. And, in fact, Schiff does have that obligation. Schiff has that obligation because he has made statements that, under this court's case law, in Burlington, under Oran, under Wiener, where if he made statements in the analyst conference calls, which he later learned were or had become false and misleading, he had an obligation to correct those misstatements and the 10-Q, which he prepared within 21 days of the analyst conference call, provided him with a ready opportunity to correct those misstatements. Schiff is arguing that he doesn't have to correct those statements. He doesn't have any obligation in the 10-Q, and the district court came up with a number of reasons for why that he didn't have to correct them in the 10-Q, almost all of which the defense has abandoned. They make only feeble arguments to say he should use an 8-K instead of a 10-Q, but the 10-Q says, if you haven't corrected this in the 8-K, you've got to correct it now. Is it your position that he had the duty to do that, whether we call it a fiduciary duty or not? He has a duty to do that under the third prong of Oran, because he's correcting a prior false or misleading statement. And the fiduciary duty point is relevant to the You stumbled on the use of the word fiduciary. I'm trying to throw a batting practice pitch at you. Sorry. Are you saying that under the third prong of Oran, he had a duty forget whether it was fiduciary or not, to correct misstatements? Yes, he did. But is he still liable under other theories that you have for those alleged misstatements? We certainly hope to prove so, but the defendant is certainly not admitting that he is. If he takes the position, as Lane made most clear, that these were off-the-cuff statements made in response to questions, and therefore they didn't have all the facts in front of them, so therefore they didn't know they were false and misleading when they were made, then we have a right to come back and say, well, even if that's true, you learned while you were preparing the 10-K that they were false and misleading, and you should have corrected them in the 10-Q. Is there anything, by the way, on the Daubert issue you want to talk about before we get Mr. Zernow? Yes, Your Honor. In the Daubert issue, Your Honor, the government presented an expert with a narrow question to answer. Did the April 3rd special announcement cause the April 4th stock price drop? I thought Dr. Wazon said he was asked to look at April 1, April 3, and April 25. He initially was, Your Honor, but we narrowed the scope of the information we were trying to admit. Did he say that in the testimony, that he realized that that was narrowed? It was decided before the hearing that each of the experts would only testify about April 3rd, and they understood that, and the hearing went along accordingly without any difficulty. Wasn't that part of the Court's problem? The Court made that into a problem, Your Honor, but it was not a problem. The government obviously can ask to admit three things and admit only one, and as I said, the hearing went along fine, admitting only April 3rd. The only issue that did is, well, whereas having been the author of Merck, his defendant had previously argued that everything that was disclosed on April 1st, April 3rd, and April 25th had already been disclosed, and that therefore there could be no stock price drop. All the reduction of evidence to April 3rd did was, he also could argue that it was already disclosed on April 1st. But April 1st said, we're just, April 1st is giving the annual report of the company and says, we're having a, we, here's the overall state of the company, but there's something we're looking into, and we're going to tell you the precise financial effects of it later in April. And then two days later, they make this disclosure of the three effects, that one of the perpetrators of the fraud has left the company, that the, and based in large measure on the inventory issues, that the fact that they've been building up this inventory to work down, and therefore they're going to have to stop selling for a while, and the fact that now that they've stopped hiding the gap, there's a gap. And those three things, our expert, the District Court conceded, reliably, reliably determined that April 3rd caused April 4th. The only issue that was left was whether April 3rd was, what all the negative items in April 3rd were related, and we proffered at the proper time, during the Daubert hearing, that our fact witnesses would show that they were all related to the fraud. If you've been planning to introduce the fact witnesses as foundation long before, or before the Daubert hearing, why wasn't the foundation included in Dr. Wasson's expert report? Dr. Wasson's expert report has to give a summary of the basis on which he relies. He was not relying on this because this was a different part of the question. There were two parts. The part that Dr. Wasson addressed, did April 3rd, the special announcement, cause the April 4th stock price drop, which he answered reliably. And then, we proved with our fact witnesses that all three of the negative announcements in April 3rd were related. But you didn't announce that until the end of, that you were going to bring these fact witnesses to testify until the end of the Daubert hearing. We had announced eight months before that it was our position that all three of these things were related, and then we brought forth the factual proffer at the time when factual proffers are supposed to be made. When the experts, when you have the expert Daubert hearing. And we made that known at that time, Your Honor, because that's the point where the judge, having determined what the expert is talking about, has to determine if he's relevant to the remainder of the case. And that's when counsel's job is to proffer what the remainder of the case will be. And this was part of the remainder of the case. Thank you very much. Thank you. Back in rebuttal, Mr. Zernath. Good afternoon, Your Honors. May it please the court. My name is David Zornow, and I represent Frederick Schiff, as I did in the proceedings below. Let me try to pierce through some of the confusion that I think you may now get a sense that the district court was dealing with in the presentation of these arguments. First point deals with the conference calls and the claim by the government that Mr. Schiff had a criminal omission liability potential by sitting at a conference call when Mr. Lane was making the statement. That's issue number one. And Judge Ambrose, it is absolutely clear on the record of October 30th that the government conceded that the third prong of Oran did not apply because that prong applies in the situation where you're making your own statement. What was the cutoff for let's assume for the moment you're correct and that they went beyond fiduciary duty as a theory prior to the March 19 hearing. What was the cutoff then for them to have added a theory of liability? The district court was incredibly generous in listening to the government coming up. We're trying to come up with theories in this case. As late as February 26th, which was three weeks before the trial, she was still asking the government what its theories were. And they kept shifting and they kept changing. The theory on the Barry point, I'll call it the Barry point, is this fiduciary duty point. And it is absolutely clear that what the government is saying, they're not, they can't backtrack and go back to the third prong of Oran. They've got to have you create a new fiduciary duty prong of the Oran test. And there's no basis for it. They rely on Chiarella, which is a completely inapposite case that deals with the question of in an insider trading context, whether someone has the duty to disclose based on a fiduciary duty. That's picked up by the second prong of Oran. So What, the statutory duty? The insider trading. I'm sorry, the first prong. What you have here is a situation and your honor is quite right. The government is free to introduce Mr. Lane's alleged misstatements in this case. It has primary liability claims against Mr. Schiff for his statements and his alleged omissions during the conference calls. It has aiding and abetting. It has conspiracy. It has scheme liability that's still in this indictment. The only thing that the court has excluded at this point is the notion that Mr. Schiff can be held criminally liable for not speaking up when Mr. Lane made a statement on a conference call. And the Barry case is really an outlier case. And as your honor points out, it cites without any analysis. A case in the Southern District of Ohio, Smart Talk, which in dicta makes this comment. Without any analysis of 10b-5b, without any analysis of a fiduciary duty. It gets picked up in the Barry case and that's what you're left with. It's an argument that runs completely against all of the bright line cases that are out there, including in the Second Circuit, the Eleventh Circuit, and a number of district court opinions in this circuit, which in dealing with civil cases have been very careful because of the language of the rule which talks about make a statement. Those cases have found that the liability in 10b-5b is restricted to one's own personal statements. Unless any of my colleagues have questions about the theory of liability, I'd like to shift to the Dahlberg issue. Let me express a concern. We are living in a world where we are seeing a lot of Ponzi schemes, representations that companies have profits, have assets that they don't have. And if what is done is within the statutory language, even though it has not yet been held to be within the statutory language, doesn't this offer us an opportunity to make sure that other officers in a corporation are alert to what is going on, and will stand up and have a responsibility even if they aren't involved in wrongdoing, when they see that there are proceedings or actions which are dubious taking place in a corporation to speak to them if they hear other corporate officers making misrepresentations? Your Honor, I would say a couple of things. Number one, you've got the aiding and abetting statute, you've got the conspiracy statute, so there is no question that if the jury finds in this case and other cases that somebody stood by and had criminal intent and was part of a scheme, and you have scheme liability under 10B. So this is not a situation where the governing statutes and our traditional are not adequate. On the other side of the ledger, you would be opening up the floodgates if you create a judge created fiduciary duty that in effect compelled an officer or an employee of a company to speak up every time he perceived that there might be misinformation out in the world. I mean, you can imagine here, Mr. Schiff was in a conference call, but what if he were down the hallway? What if he learned about it the next day? We aren't dealing with the facts as they are limited by this case. We are in a conference call. The whistleblower may not be part of the scheme, but the whistleblower is hearing a fellow corporate officer make misrepresentations  a significant effect on convincing analysts that this is a solid corporation rather than a facade. Your Honor, I would encourage you to look at our citations to cases like In re Nash Finch and Harmonic Securities. These are cases in which the courts were confronted with the claim that someone should have been responsible for somebody else's statements on a conference call, and you're into a deep, deep, slippery slope when you don't need to go there. I would encourage the court to beware of such as the government in this case asks for an exception to a rule that covers the specific facts of this case. As your Honor knows, it's never that easy. It opens up the floodgates in the area of plaintiffs securities class actions, for example, where the courts have been very careful in the wake of Central Bank to limit the ability of plaintiffs to backdoor the Supreme Court's rule that there's no aiding and abetting liability in a civil case. Here the government has the aiding and abetting liability. They've got the conspiracy liability. They've got the scheme liability. And I think Judge Alarcon raises a good question in the sense of what are we doing here? We were ready to go to trial. We were five days away from trial in this case. It sounds like to me that you're saying that the evidence that the court said was not admissible would be admissible as part of a conspiracy theory and part of an aiding and abetting theory. That is absolutely correct, and she made that clear in her opinion. The evidence is coming in. On Dalbert. On Dalbert, Your Honor, obviously we're dealing with an abusive discretion standard and... But it's, you know, for Dr. Wazon to testify, I mean, and to base your turning him down on fit, that's a pretty low bar, isn't it? I mean, it's got to be an expert, it's got to be the methodology, and it's got to fit this particular trial. I had guessed it might have been methodology that the court would have gone off. I was surprised to see, or somewhat surprised to see it was the third problem. I think she went off on both methodology and fit, Your Honor. I think what she said is that in a situation like this where you're arguing materiality to the jury, and you want to stand up in front of the jury and say, this is material because this was a $10 billion fraud, or a $30 billion fraud, the numbers kept shifting. The court said back in July of 07, you've got to show me that there's some relevance to this evidence on materiality by linking the disclosure to the alleged fraudulent conduct. And the government completely missed the boat here. It's expert, and under instructions from the government, looked at the announcement on April 3rd in the aggregate without in any way attempting, and this is the methodological flaw, without in any way seeking to isolate the effect of the different announcements that took place on that day. And the expert testified, Your Honor, that he could have done that, but he was instructed not to. So that's methodological flaw number one. Methodological flaw number two is what happened as a result of the fact that 15 minutes before the hearing, they announced that April 1st was now off the table. And as Your Honor knows, having authored the decision in the Merck case, that presented a Merck issue. And indeed, there was a Merck issue in the case even without that, because there were disclosures relating to the inventory here that had taken place even earlier that our expert had addressed in his expert report. Mr. Hubbard? Mr. Hubbard. Dr. Wazzan didn't even address the question of whether anything that was disclosed on April 3rd was a redisclosure of what had been disclosed on April 1st, let alone what had been disclosed in the prior fall and in January in an analyst report. So there are two significant methodological flaws that the judge identified in this case, and also came to the conclusion that the way the government went about it, the jury was going to be exposed to a situation where they would speculate that this massive drop in the stock price was attributable to the defendant's actions without any effort on the expert's part to make that connection. How's the government then going to be able without Dr. Wazzan, how's the government going to be able to prove the element of materiality? There are many ways to prove the element of materiality. You don't need to prove it through stock price drop. You can call witnesses from the company. You can call investors. There are many ways to prove to a jury that an alleged non-disclosure of a piece of information by a criminal defendant was material other than standing up in front of a jury as early as the opening statement and waving the banner of this massive stock price drop without any analysis as the court required as a predicate. Now, Dr. Wazzan did what, an event study? He did an event study, and he acknowledged that it is an absolutely crucial element of an event study to determine when the information was first disclosed. But he didn't do that. He wasn't asked to do it by the government. He could have done it. He didn't do it. Why not allow him to testify as an expert and allow you to cross-examine him? I'm sure it'll be a withering cross-examination. Your Honor, I appreciate that, but if the gatekeeper role under Daubert is to mean anything, this is right in the heartland of what the court's, the district court's, discretion is all about. This is not a case I would submit respectfully to this court where you can say that Judge Hochberg abused her discretion. There was no analysis here. Everybody was on notice in this case months before as to what the issue was, and the government just blithely went along, put up an expert report that had nothing to do with the issues in the case. And that's not to mention, by the way, this whole factual proffer notion. They completely changed gears. They didn't make a factual proffer. They made a sentence after the Daubert hearing had been completed saying, we have witnesses. After having said all along, we don't have to show causation. This is not a causation case. And then after their expert gets off the stand, they stand up and say, oh, well, wait a minute. We're going to have factual witnesses who will be able to tie these disclosures together, i.e. causation. This thing was just mishandled, and this is a quintessential case, Your Honor, where the district court, as the gatekeeper, should be a court of the discretion to keep the expert off the stand where there is a great potential for juror confusion and speculation, and the prejudicial impact of that way outweighs the probative value. There really is almost no probative value in the way that Mr. Wesson's testimony was teed up here. How's that? I mean, he's saying that clearly that you take one, well, initially he was saying you take April 1, April 3, April 25, and it shows that there was a, in effect, there was something being done to alter the price of the stock. Now, when he gets up there, the problem was that purportedly they wanted him then to concentrate on April 3. Is that really much of a change of... Okay, fine. It's really just dealing with a subset of what he initially was asked to talk about. Well, there are two things. Number one, even in what he initially did, he never looked to disaggregate the various announcements that were made on April 1 and April 3 and April 25. I mean, on April 3, the impact on quarterly earnings as a result of the inventory work down, which is clearly related to the issues in this case, but there was also an announcement that Mr. Lane was leaving the company, and most importantly, there was an announcement that there was a significant drop in demand for some of the company's most important products that was going to lead to a very significant decrease in the earnings per share. He didn't even make the effort, and he said he could have and would have if the government had asked him to do it. He didn't even make that analytical step, which was critical. It's not only what else was going on in the market, it's what's going on in the announcement. And then beyond that, you have the problem of not having addressed, even before they dropped April 1, there was a significant issue, as I said before, with regard to the event study methodology in terms of identifying when there was an initial disclosure here. There had been disclosures in October of 2001. There had been a disclosure of buildup of inventory in January of 2002. There had been analyst reports, very similar to the Wall Street Journal piece that was at issue in the Merck case, where a UBS analyst, based on publicly available information, had sized the buildup in inventory. So even before you dropped April 1, the method here was flawed. Let's go to the third prong of Dalton. Why was this not a good fit for what he did? Obviously, we've been talking almost exclusively so far on methodology. Well, I think it follows that in order for it to fit, it's got to tie the stock price has to be hedged non-disclosures. And the problem here is that he didn't take into consideration sure the stock price dropped after April 3rd. The question is why did it drop? What was there about that announcement that caused the stock price to drop? Was it the announcement about inventory workdown? Was it the announcement about Mr. Lane? Or was it the announcement about a dramatic fall-off in demand for the company's products? He needed to fit his testimony to this case by linking it. Without that linkage, there's no relevant evidence as to materiality. And the jury is left to speculate. And that, by the way, it seems to me from the beginning, is an absolutely crucial aspect of this prong of Dabbert. And it's inherently within the discretion of the district judge to size whether there is going to be speculation and whether the prejudicial impact of the testimony is going to outweigh any possible probative benefit. So when you marry the methodological flaws with the fact that he didn't, at the government's instruction, didn't tie the announcements to what's at issue in this case, you put that together and I can't see how the court can say that the I have no further questions. Thank you, Your Honor. Mr. Leone? Thank you, Your Honor. Let me talk first about the Dabbert issue. The expert here was asked to answer a specific question. He answered it reliably. There is no question that saying this April 4th stock price drop was not caused, as the defendants originally claimed, by 9-11 or by problems in the pharmaceutical industry, but in fact by the April 3rd announcement that no other economic, market, or industry fact caused this drop. It's helpful to the jury. And as you said, Your Honor, the bar is not that high. As far as a methodological problem, there is no methodological problem here because the expert answered the question that was in front of him. The defendant's argument is that he had to disaggregate these things, but he testified he could not do so to a mathematical certainty, and their expert confirms that traditional event studies cannot do so, and that it would not be appropriate to do so because if, unless you knew they were unrelated. Here, we are going to show that they are all related. It would be inappropriate to break this out and unnecessary to break this out. And in fact, their experts, despite his credentials, all he does is he simply assumes, as the defendant wants you to assume, that the gap between demand-based sales and sales projections has nothing to do with this at all. That was the entire purpose of the fraud, was to conceal that gap. So the revelation of that gap on April 3rd is directly related to this fraud, as is Mr. Lane's departure from the company. The defendant argues that this, we should have had our expert do this, the court ordered us to do that. In fact, the court said you design your expert testimony to what you think needs to be addressed by an expert, and we did so. We brought in fact testimony to answer the fact question, is this, are the announcements in this item all related to the fraud, and are they new or have they been previously disclosed? Those are fact issues, which we will address with fact witnesses. So the district court here cannot exclude this under methodology because the methodology was reliable on the question that he was asked, and she cannot exclude it based on fit because the standard, as you said, is not that high. And she excluded it on the basis that you asked the wrong question? She can't exclude it on the idea that she ordered us to answer a different question because she didn't order us to do so. She explicitly refused to give us any guidance whatsoever, but she can't because in fact this answers a question that proves a material fact and is helpful to the jury and fits with our other evidence. She's not in charge of designing the party's evidentiary submissions. She just has to determine if the portions of that they handled with an expert are sufficient. This is like the Ford case. In Ford, the defendant said, you can't admit this expert. He can't rule out other people's shoes caused this. All he can say is the shoes are within a class. And this court said, that's not appropriate as long as the evidence is helpful to the jury by saying this bank robber's shoes fit within the class that caused this print. He doesn't have to say these shoes caused this print. They can make the proof of which whether the bank robber committed the bank robbery or not with other evidence, and that's what we're doing here. So here the district court simply misapprehended her role. She made fact findings at the Daubert stage that she's not allowed to make. She refused to accept the proffer. She's not allowed to do that either. And she made no 403 ruling as defendant was intimated. If they could point to one, they would. She did not make a 403 ruling. She didn't even ever state the standard for 403 accurately. She simply cannot in her role of gatekeeper find facts and exclude reliable testimony. She's not the jury. The jury gets to hear our evidence. She doesn't get to decide that the jury can't hear our evidence in this case. As far as the earlier two issues about omissions liability, let me briefly state As to Mr. Schiff's own misstatements, alleged misstatements, what are your theories that you're appealing exactly? The theory that we're appealing on Schiff's own misstatements are the theories that are adopted by this court in Iran and Burlington and Wiener, which is that if a person makes a statement, which at the time they don't happen to know is false or misleading, if they later learn that statement was or became false or misleading, they have an obligation to correct it or to update it. That's plain, straight Third Circuit law. All the merits based reasons why the district court said that shouldn't be admitted were all abandoned by the defendant because they're all merits. I thought a duty to correct from Burlington is when a company makes a historical statement that at the time made the company believed to be true and then later found it wasn't true. That's correct. Or a forward projection. Burlington broadened that. And then a duty to update concern statements that although reasonable at the time made become misleading when viewed in the context of subsequent events. That's correct. So, but here I thought you were saying that in effect he was part of a scheme to make direct misstatements with respect to channel stuffing. We are alleging both, Your Honor. We're alleging that he's making false, that he's making misstatements that he knows to be false but the law under Oran and Burlington says that even if that's not true, he is still liable if he learned later on they were misleading and he didn't correct it. And the idea that we waived this, let me just tell the court, it says here's what we're arguing to the court. Lane is also responsible for his own inaccurate, incomplete or misleading prior disclosures. He has a duty to correct his own statements which even if believed to be true when made were later revealed actually to be untrue. Likewise, Lane has a duty to update his statements that although reasonable at the time made became misleading when viewed in the context of subsequent events. We're siding around, we're siding Weiner, we're siding Burlington and when we get to, when Schiff gets to adopt Lane's motions, we make the same statement as to him. The court says, what are your, how do you contend that Mr. Schiff is liable? We say he's liable if he said it when he knew it was untrue. We say he is liable he's responsible for his own prior statements to update and correct them. So the only real argument defendant has on that prong is that we waived it and we clearly did not waive it. And on the first issue... It sounds like what you're saying is he made direct misstatements but if he did not, your fallback is that he later discovered that the statements were not correct and therefore he needed either to update them or to correct them. Is that correct? Yes, and that's governing third circuit law. But then the court talked about later on the quote all of a piece close quote theory. Is that correct? We had raised that also. We were defendant's argument was that the 10 cues were too remote from the analyst conference calls to be used to correct them. And we argued they were all in the piece they're within three weeks of each other they're addressing the same quarter's results that that was an appropriate opportunity for him to make these corrections and it's important evidence for us to show that he did not. Because he will claim that he didn't know at the time that they were false. But I thought early on in your brief that you were saying that you had three-thirds liability, direct misstatements the duty to update and the duty to correct, which I said to me sounded like a fallback. What did you say in your brief that there was, or at some point that there was the all of a piece, that is the misstatements coupled with the SEC filings? That was made as a part of the argument as to why these two, the analyst conference calls and the 10 cues were related to each other and why he had to correct the analyst conference call misstatements in the 10 cues. I see my time is up. If I may briefly touch on the last point. I think it's important. These are long briefs. It's a complicated case. I think this court, when it goes back and looks at them, will sort this all out. But it's important to note there's no real waiver argument as to the Barry fiduciary duty argument. We raise that issue repeatedly. Barry is not an outlier. It's been followed, including the Enron prosecution, which is certainly not a low-key prosecution. Judge Roth, your concern, this sets up fraud. This says to a person like Schiff, I can sit there and if someone else says something that I know is false and I can correct it, I can sit there and say I intended to fraud the shareholders by letting that one go because unless they prove I was a conspirator with him or knew in advance what he was going to say, then I'm not liable. And you don't want that in this corporate environment. But part of the problem, for example, when you talk about fiduciary duty, it looked to me as if what you're asking us to do is, as Mr. Zorno said, to have judge-made law with respect to an expansion of fiduciary duties that's beyond what states have done. And it would seem that that's a plausible argument, that you're asking us to intrude ourselves and to add a gloss onto what states have found with respect to fiduciary duty. No, we're just asking you to apply 10b-5b, which says that if you are liable, if you admit to state a material fact that is necessary to make a prior statement, not misleading. And that's all that is here. The fiduciary duty explains that you cannot have a duty disclosed unless, you cannot be liable for silence unless you have a duty disclosed. So under federal law, we have to show the duty disclosed. And the duty disclosed is shown under Berry and under fiduciary duty because the officer has an obligation because he's a high corporate officer, and even more importantly, because he is a joint spokesperson for the company, to make sure their joint presentation is accurate. And that's why this Floodgates argument is unavailing. We're not asking for Mr. Schiff to be liable if he's in the bathroom down the hall, or if he's not participating in the conference call at all. The company put these two people out there to make a joint presentation, to get the benefits of a joint presentation, and they have to have the responsibilities of a joint presentation, which is, if they're in their joint presentation to investors or to analysts, they have to make sure that their joint presentation is accurate. And they cannot, with the intent to defraud, sit there and let material inaccuracies go forth. Thank you very much. I think it's well briefed. You did an exceptional job, both of you, both at oral argument and in connection with the briefing. In fact, so well that I would ask that after we adjourn, that you get together with Ms. Zversky, the court crier, and arrange for a transcript to be ordered of this oral argument. Very well done. Thank you.